# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF FLORIDA

|  |  |
|---|---|
| IN RE ZEROED-IN TECHNOLOGIES, LLC DATA BREACH LITIGATION | Master File No. 2:23-cv-01131-JES-KCD<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

Plaintiffs, Holly Adkisson, Jaqueline Biles, Melody Brantley, Danielle Cooke, Dominick Garland, Paula Hasenei, Christopher Ingram, Edward McNanna, and Cynthia Rivera, individually and on behalf of the Class defined below of similarly situated persons, allege the following against Zeroed-In Technologies, LLC ("Zeroed-In"), Dollar Tree, Inc. and Family Dollar, LLC ("Family Dollar") (Dollar Tree, Inc. and Family Dollar collectively referred to herein as "Dollar Tree") (all collectively "Defendants") based upon personal knowledge with respect to themselves and on information and belief derived from, among other things, investigation by Plaintiffs' counsel and review of public documents as to all other matters:

## SUMMARY OF THE CASE

1.      This case involves the unauthorized breach of Defendant Zeroed-In's computer networks announced on November 27, 2023, wherein—from August 7, 2023 to August 8, 2023—the personal identifiable information ("PII"), including names, birth dates, and/or Social Security numbers ("SSN"), of about 2 million

individuals was exposed due to a flaw in Defendant Zeroed-In's information technology systems, which allowed hackers and other bad actors to obtain individuals' PII for unsavory and illegal purposes (the "Data Breach").

2.     Among those affected by the Data Breach include both current and former employees of Dollar Tree, whose PII was compromised.

3.     This Consolidated Class Action Complaint is filed on behalf of all affected persons in the United States, described more fully in the following sections, whose PII was compromised in the Data Breach.

## JURISDICTION AND VENUE

4.     The Court has subject matter jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. Upon information and belief, the number of class members is over 100, many of whom have different citizenship from Defendants. Thus, minimal diversity exists under 28 U.S.C. § 1332(d)(2)(A).

5.     This Court has general personal jurisdiction over Defendant Zeroed-In because Zeroed-In is incorporated in Florida and has its principal place of business in Fort Myers, Florida.

6.     This Court has specific personal jurisdiction over Defendants Dollar Tree, Inc. and Family Dollar because they  have availed themselves of the rights and benefits of the state of Florida by engaging in activities including (i) directly

and/or through their parent companies, affiliates and/or agents providing services throughout the United States in this judicial district and abroad; (ii) conducting substantial business in this forum, including but not limited to (and as to all Plaintiffs), business with their vendor, Defendant Zeroed-In; and (iii) perpetrating tortious acts in Florida.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because it is the district within which Defendants have the most significant contacts.

**PARTIES**

**A. Plaintiffs**

**Holly Adkisson**

8.      Plaintiff Adkisson is an adult individual and citizen of Missouri.

8.      Plaintiff Adkisson is a former employee of Dollar Tree and, upon information and belief, provided her PII—including her name, date of birth, and Social Security number—to Dollar Tree as a condition of employment. Her PII was then stored and maintained by Zeroed-In.

9.      Plaintiff Adkisson received a letter from Zeroed-In notifying her of the Data Breach and of the unauthorized exposure of her PII.

10.     Plaintiff Adkisson values her privacy and makes every effort to keep her personal information private.

11.     Since the Data Breach, Plaintiff has already been the victim of identity theft.

12.     Since the Data Breach, a 2018 Nissan Altima—not belonging to Plaintiff Adkisson—has appeared on Plaintiff's credit report.

13.     Also after the Data Breach, Plaintiff Adkisson was forced to obtain a new credit card because of unauthorized transactions charged to her prior credit card.

14.     As a result of the Data Breach, Plaintiff has had to spend approximately twenty-five (25) hours dealing with the consequences of the Data Breach. This time and effort spent by Plaintiff consists of: monitoring her accounts to detect suspicious and fraudulent activity to mitigate against potential harm; researching the potential consequences of the Data Breach; and cancelling her credit card and obtaining a new one.

15.     Plaintiff remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen. Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in her name, medical services billed in her name, tax return fraud, utility bills opened in her name, credit card fraud, and similar identity theft.

16.     Plaintiff Adkisson will now be forced to review credit reports and monitor financial accounts and medical records for fraud or identify theft –

particularly since the compromised information may include Social Security numbers.

**Jaqueline Biles**

17.     Plaintiff Biles is an adult individual and citizen of Florida.

18.     Plaintiff Biles, a former employee of Dollar Tree, provided her PII to Dollar Tree as a condition of employment. Upon information and belief, her PII was stored and handled by Zeroed-In.

19.     Plaintiff Biles received a letter from Zeroed-In notifying her of the Data Breach and of the unauthorized exposure of her PII.

20.     Plaintiff values her privacy and makes every effort to keep her personal information private.

21.     Since the Data Breach, Plaintiff Biles has already been the victim of identity theft.

22.     Upon information and belief, after the Data Breach, an unknown individual attempted to withdraw money out of Plaintiff's CashApp account.

23.     Since the Data Breach, Plaintiff has also experienced a significant increase in the frequency of spam telephone calls, text messages, and e-mails from individuals who have clearly obtained her private information.

24.     To avoid the nonstop harassment to Plaintiff from the increased spam, Plaintiff Biles was forced to change her phone number.

25.     Plaintiff Biles faces a substantial risk of being targeted in the future for phishing, data intrusion, and other illegal schemes based on her PII, as potential fraudsters will use exposed information to target Plaintiff more effectively.

26.     Plaintiff has already been notified that her information has been detected on the dark web.

27.     As a result, Plaintiff obtained a freeze of her credit file from Experian, Equifax, and TransUnion. The credit freeze remains in effect.

28.     Plaintiff has had to spend over three (3) hours dealing with the consequences of the Data Breach. This time and effort spent by Plaintiff consists of: monitoring her accounts to detect suspicious and fraudulent activity to mitigate against potential harm; researching the potential consequences of the Data Breach; and withstanding the nuisance and annoyance of the spam texts, e-mails, and/or phone calls.

29.     Plaintiff remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen. Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in her name, medical services billed in her name, tax return fraud, utility bills opened in her name, credit card fraud, and similar identity theft.

30.     Plaintiff will now be forced to review credit reports and monitor financial accounts and medical records for fraud or identify theft – particularly since the compromised information may include Social Security numbers.

**Melody Brantley**

31.     Plaintiff Melody T. Brantley is an adult individual and citizen of Texas.

32.     Plaintiff Brantley, a former employee of Dollar Tree, provided her PII to Family Dollar—including her name, date of birth, and Social Security number— and upon information and belief, that PII was stored and maintained by Zeroed-In.

33.     Plaintiff Brantley received a letter from Zeroed-In notifying her of the Data Breach and of the unauthorized exposure of her PII.

34.     Plaintiff values her privacy and makes every effort to keep her personal information private.

35.     After learning of the Data Breach and out of concern for her identity, Plaintiff established a credit monitoring account Equifax on or about December 5, 2023.

36.     On or about December 10, 2023, Plaintiff Brantley purchased credit monitoring under Incogni and Experian, costing Plaintiff approximately $12.99 per month.

37.     Since the Data Breach, Plaintiff Brantley has already been the victim of identity theft. Upon information and belief, Plaintiff received a notice from an unknown individual by phone, mail, or text about an "account inquiry."

38.     Plaintiff Brantley has also received information that since the Data Breach, her PII is on the dark web; Plaintiff Brantley subsequently took steps to obtain a credit freeze as a result of learning this information.

39.     Since the Data Breach, Plaintiff has experienced a significant increase in the frequency of spam telephone calls and emails from individuals who have clearly obtained her private information.

40.     Plaintiff Brantley is now forced to live with the anxiety that her PII is being disclosed to the entire world, thereby subjecting Plaintiff to embarrassment and depriving her of any right to privacy whatsoever.

41.     As a result of the Data Breach, Plaintiff Brantley has had to spend over twenty-five (25) hours dealing with the consequences of the Data Breach. This time and effort spent by Plaintiff consists of: monitoring her accounts to detect suspicious and fraudulent activity to mitigate against potential harm; researching the potential consequences of the Data Breach; locking her credit account with Experian, TransUnion, and Equifax after finding out that her PII was detected on the dark web; and going to and consulting her bank about the Data Breach, potential data theft and precautions to be taken.

42.     Plaintiff remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen. Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in her name, medical services billed in her name, tax return fraud, utility bills opened in her name, credit card fraud, and similar identity theft.

### Danielle Cooke

43.     Plaintiff Cooke is an adult individual and citizen of Virginia.

44.     Plaintiff Cooke, a former employee of Dollar Tree, provided her PII to Dollar Tree as a condition of employment. Plaintiff's PII was then stored and maintained by Zeroed-In.

45.     Plaintiff Cooke received a letter from Zeroed-In notifying her of the Data Breach and of the unauthorized exposure of her PII.

46.     Plaintiff values her privacy and makes every effort to keep her personal information private.

47.     Since the Data Breach, Plaintiff has already been the victim of identity theft.

48.     Upon information and belief, after the Data Breach, an unknown individual used Plaintiff's PII to open a bank account on or about September 8, 2023. Plaintiff discovered the bank account when she received a statement in October 2023.

49.     Since the Data Breach, Plaintiff has experienced a significant increase in the frequency of spam telephone calls and emails from individuals who have clearly obtained her private information—Plaintiff receives five (5) to six (6) spam text messages per day.

50.     Plaintiff Cooke faces a substantial risk of being targeted in the future for phishing, data intrusion, and other illegal schemes based on her PII, as potential fraudsters will use exposed information to target Plaintiff more effectively.

51.     Plaintiff is now forced to live with the anxiety that her PII may be disclosed to the entire world, thereby subjecting Plaintiff to embarrassment and depriving her of any right to privacy whatsoever.

52.     After learning of the Data Breach, Plaintiff purchased credit monitoring service from Life Lock for approximately $239.88 per year.

53.     As a result of the Data Breach, Plaintiff has had to spend approximately forty (40) hours per week dealing with the consequences of the Data Breach. This time and effort spent by Plaintiff consists of: monitoring her accounts to detect suspicious and fraudulent activity to mitigate against potential harm; researching the potential consequences of the Data Breach; going to and consulting her bank about the Data Breach, potential data theft and precautions to

be taken; and withstanding the nuisance and annoyance of the nonstop spam texts, e-mails, and/or phone calls.

54.     Plaintiff remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen. Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in her name, medical services billed in her name, tax return fraud, utility bills opened in her name, credit card fraud, and similar identity theft.

### Dominick Garland

55.     Plaintiff Garland is an adult individual and citizen of Maryland.

56.     Plaintiff Garland, a former employee of Dollar Tree, provided his PII--including his name, date of birth, and Social Security number—to Dollar Tree as a condition of employment. Upon information and belief, his PII was stored and maintained by Zeroed-In.

57.     Plaintiff Garland received a letter from Zeroed-In notifying him of the Data Breach and of the unauthorized exposure of his PII.

58.     Plaintiff values his privacy and makes every effort to keep his personal information private.

59.     Since the Data Breach, Plaintiff has already been the victim of identity theft.

60.     Plaintiff's CashApp account was used by an unknown individual to make a charge for $50.00 and a second charge also for $50.00. These charges were not made nor authorized by Plaintiff Garland.

61.     As a result of the CashApp incident described above, Plaintiff was forced to cancel his existing CashApp account and open a new account; Plaintiff spent approximately four (4) hours dealing with the CashApp incident.

62.     Since the Data Breach, Plaintiff has experienced a significant increase in the frequency of spam telephone calls and emails from individuals who have clearly obtained his private information.

63.     Plaintiff Garland has also received various strange e-mail messages since the Data Breach from unknown individuals asking Plaintiffs to participate in contests.

64.     Plaintiff faces a substantial risk of being targeted in the future for phishing, data intrusion, and other illegal schemes based on his PII, as potential fraudsters will use exposed information to target Plaintiff more effectively.

65.     Plaintiff is now forced to live with the anxiety that his PII may be disclosed to the entire world, thereby subjecting Plaintiff to embarrassment and depriving him of any right to privacy whatsoever.

66.     As a result of the Data Breach, Plaintiff Garland has had to spend approximately seven (7) days dealing with the consequences of the Data Breach.

This time and effort spent by Plaintiff consists of: monitoring his accounts to detect suspicious and fraudulent activity to mitigate against potential harm; researching the potential consequences of the Data Breach; resolving the fraudulent charges on his CashApp account; canceling his CashApp account and creating a new one; and going to and consulting his bank about the Data Breach, and potential data theft and precautions to be taken.

**Paula Hasenei**

67.     Plaintiff Hasenei is an adult individual and citizen of Georgia.

68.     Plaintiff Hasenei, an employee of Dollar Tree, provided her PII to Dollar Tree—including her name, date of birth, and Social Security number—and upon information and belief, that PII was stored and maintained by Zeroed-In.

69.     Plaintiff Hasenei received a letter from Zeroed-In notifying her of the Data Breach and of the unauthorized exposure of her PII.

70.     Plaintiff values her privacy and makes every effort to keep her personal information private.

71.     Since the Data Breach, Plaintiff has already been the victim of identity theft. Upon information and belief, on November 25, 2023, Plaintiff Hasenei received a fraud alert from Truist bank regarding an unauthorized credit card charge for $39.99 posted to her account.

72.     Plaintiff is now forced to live with the anxiety that her PII is being disclosed to the entire world, thereby subjecting Plaintiff to embarrassment and depriving her of any right to privacy whatsoever.

73.     As a result of the Data Breach, Plaintiff Hasenei has had to spend several hours dealing with the consequences of the Data Breach. This time and effort spent by Plaintiff consists of: monitoring her accounts to detect suspicious and fraudulent activity to mitigate against potential harm; researching the potential consequences of the Data Breach; and investigating the fraud alert from Truist bank.

74.     Plaintiff remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen. Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in her name, medical services billed in her name, tax return fraud, utility bills opened in her name, credit card fraud, and similar identity theft.

### Christopher Ingram

75.     Plaintiff Ingram Christopher Ingram is an adult individual and citizen of South Carolina.

76.     Plaintiff Ingram, a former employee of Dollar Tree, provided his PII to Dollar Tree as a condition of employment. Upon information and belief, his PII was stored and handled by Zeroed-In.

77.     Plaintiff Ingram received a letter from Zeroed-In notifying him of the Data Breach and of the unauthorized exposure of his PII.

78.     Plaintiff Ingram values his privacy and makes every effort to keep his personal information private.

79.     Since the Data Breach, Plaintiff has already been the victim of identity theft—specifically, Plaintiff Ingram has been notified that his PII has been detected on the dark web.

80.     Plaintiff Ingram has also received a fraud alert e-mail regarding a McAfee account since the Data Breach.

81.     On or about November 2023, Plaintiff received e-mails confirming loan applications which he never filed.

82.     Given the identity theft already experienced by Plaintiff Ingram, Plaintiff Ingram faces a substantial risk of being targeted in the future for phishing, data intrusion, and other illegal schemes based on his PII, as potential fraudsters will use exposed information to target Plaintiff more effectively.

83.     Plaintiff is now forced to live with the anxiety that his PII has been disclosed to the entire world, thereby subjecting Plaintiff to embarrassment and depriving him of any right to privacy whatsoever.

84.     As a result of the Data Breach, Plaintiff Ingram has had to spend approximately ten (10) hours dealing with the consequences of the Data Breach.

This time and effort spent by Plaintiff consists of: monitoring his accounts to detect suspicious and fraudulent activity to mitigate against potential harm; understanding which of Plaintiff's information was detected on the dark web; researching the potential consequences of the Data Breach; and ascertaining the suspicious e-mails implicating Plaintiff's name on loan applications not filed by Plaintiff.

85.    Plaintiff will now be forced to review credit reports and monitor financial accounts and medical records for fraud or identify theft – particularly since the compromised information may include Social Security numbers.

### Edward McNanna

86.    Plaintiff McNanna is an adult individual and citizen of Illinois.

87.    Plaintiff McNanna, a former employee of Dollar Tree, provided his PII to Dollar Tree as a condition of employment. Upon information and belief, Plaintiff McNanna's PII was stored and maintained by Zeroed-In.

88.    Plaintiff received a letter from Zeroed-In notifying him of the Data Breach and of the unauthorized exposure of his PII.

89.    Plaintiff values his privacy and makes every effort to keep his personal information private.

90.    Since the Data Breach, Plaintiff has already been the victim of identity theft.

91.     In December 2023, Plaintiff McNanna received a CashApp alert that a fraudster was attempting to withdraw money from his Wells Fargo bank account using another CashApp account. Plaintiff spent time and effort attempting to resolve this issue with Wells Fargo.

92.     Since the Data Breach, Plaintiff has experienced a significant increase in the frequency of spam telephone calls and emails from individuals who have clearly obtained his private information.

93.     Given the fraud and identity theft Plaintiff has already faced, Plaintiff is at a substantial risk of being targeted in the future for phishing, data intrusion, and other illegal schemes based on his PII, as potential fraudsters will use exposed information to target Plaintiff more effectively.

94.     As a result of Defendants' conduct, Plaintiff McNanna has suffered actual ascertainable damages including, without limitation, time and expenses related to monitoring  financial accounts for fraudulent activity, facing an increased and imminent risk of fraud and identity theft, a diminution in the value of her private and confidential personal information, the loss of the benefit of her contractual bargain with Defendants, out of pocket expenses, emotional distress, and other economic and non-economic harm.

95.     As a result of the Data Breach, Plaintiff McNanna has had to spend several hours dealing with the consequences of the Data Breach. This time and

effort spent by Plaintiff consists of the following: monitoring his accounts to detect suspicious and fraudulent activity to mitigate against potential harm; researching the potential consequences of the Data Breach; consulting his bank about fraudulent activity; calling Zeroed-In to inquire about the timing of data breach notifications; and withstanding the nuisance and annoyance of the nonstop spam texts, e-mails, and/or phone calls.

96.     Plaintiff McNanna remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen. Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in his name, medical services billed in his name, tax return fraud, utility bills opened in his name, credit card fraud, and similar identity theft.

97.     Plaintiff McNanna will now be forced to review credit reports and monitor financial accounts and medical records for fraud or identify theft— particularly since the compromised information may include Social Security numbers.

### Cynthia Rivera

98.     Plaintiff Rivera is an adult individual and citizen of New York.

99.     Plaintiff Rivera, a former employee of Family Dollar, provided her PII-- including her name, date of birth, and Social Security number—to Dollar Tree

as a condition of employment. Upon information and belief, her PII was stored and maintained by Zeroed-In.

100.    Plaintiff Rivera received a letter from Zeroed-In notifying her of the Data Breach and of the unauthorized exposure of her PII.

101.    Plaintiff Rivera values her privacy and makes every effort to keep her personal information private.

102.    Since the Data Breach, Plaintiff Rivera has experienced a significant increase in the frequency of spam telephone calls, text messages, and e-mails from individuals who have clearly obtained her private information.

103.    Plaintiff Rivera is now forced to live with the anxiety that her PII may be disclosed to the entire world, thereby subjecting Plaintiff to embarrassment and depriving her of any right to privacy whatsoever.

104.    Out of concern for the security of her PII, after learning of the Data Breach, Plaintiff obtained a credit freeze on her credit file.

105.    Plaintiff Rivera has had to spend approximately two (2) days dealing with the consequences of the Data Breach. This time and effort spent by Plaintiff consists of: monitoring her accounts to detect suspicious and fraudulent activity to mitigate against potential harm; researching the potential consequences of the Data Breach; setting up the credit monitoring service offered by Zeroed-In; and

withstanding the nuisance and annoyance of the spam texts, e-mails, and/or phone calls.

106.   Plaintiff Rivera remains at a substantial and imminent risk of future harm given the highly-sensitive nature of the information stolen. Plaintiff faces a substantial risk of out-of-pocket fraud losses, such as loans opened in her name, medical services billed in her name, tax return fraud, utility bills opened in her name, credit card fraud, and similar identity theft.

107.   Plaintiff will now be forced to review credit reports and monitor financial accounts and medical records for fraud or identify theft – particularly since the compromised information may include Social Security numbers.

**B.  Defendant Zeroed-In Technologies, LLC**

108.   Defendant Zeroed-In is incorporated in the State of Florida, with its principal place of business located at 11037 Harbor Yacht Court, #201, Fort Myers, FL 33908.

109.   Zeroed-In is a data management company which provides human resources data analytics software products to businesses. Defendant's data analytics products include data extraction, data staging, data transformation, and graphing or charting of data.[1]

---

[1] *Our Solutions*, ZeroedIn Technologies, https://www.zeroedin.com/our-solutions/ (last visited Jan. 17, 2023).

110.    Defendant Zeroed-In has over 70 clients, 30,000 registered users of its data analytics software, and about 2.7 million "work lives."[2]

## C. Defendant Dollar Tree, Inc.

111.    Defendant Dollar Tree, Inc. is a publicly traded corporation incorporated in Virginia, with its principal place of business located at 500 Volvo Parkway, Chesapeake, Virginia 23320. It hosts and manages dollar stores in locations around the U.S. and Canada.

112.    At all relevant times, Dollar Tree, Inc. was a client of Defendant Zeroed-In's human resources data analytics products.[3] As a result, Dollar Tree, Inc. shares human resources PII with Defendant Zeroed-In, its third-party data analytics vendor.

## D. Defendant Family Dollar, LLC

113.    Defendant Family Dollar was formed in North Carolina and has its principal place of business at 500 Volvo Parkway, Chesapeake, VA 23330.  Family Dollar was acquired by Dollar Tree, Inc. on July 6, 2015.[4]

---

[2] *What We Do*, ZeroedIn Technologies, https://www.zeroedin.com/about-zeroedin/ (last visited Jan. 17, 2023).

[3] *Dollar Tree hit by third-party data breach impacting 2 million people*, Bleeping Computer, https://www.bleepingcomputer.com/news/security/dollar-tree-hit-by-third-party-data-breach-impacting-2-million-people/ (last visited Jan. 17, 2023).

[4] *Our Dollar Tree, Inc. Story*, https://corporate.dollartree.com/about/our-history (last visited Jan. 17, 2024).

## FACTUAL ALLEGATIONS

### A. Data Analytics

114.   Data analytics is the use of "data techniques and tools that identify patterns and trends," which subsequently produce useful insights that buttress informed decision-making.[5]

115.   The main purpose of data analytics is to tackle an organization's particular issues or questions (e.g., understand consumers, improve internal processes, generate business opportunities, etc.) to encourage better business results.[6]

116.   There are six steps in the data analysis process:[7]

1) **Specification of data requirements** – A data analyst asks the stakeholder(s) (i.e., people who have invested resources into a data analysis project) the tasks and expectations for the data analysis project.

2) **Collection of data** – After specifying data requirements, the data analyst obtains relevant raw data from several sources (e.g.,

---

[5] *What Is Data Analytics: The Ultimate Guide*, CompTIA,
https://www.comptia.org/content/guides/what-is-data-analytics (last visited Jan. 17, 2024).
[6] *Id.*
[7] *Six Steps of Data Analysis Process*, GeeksforGeeks, https://www.geeksforgeeks.org/six-steps-of-data-analysis-process/ (last visited Jan. 18, 2024).

interviews, articles, reports) and stores the data in a spreadsheet or database.

3) **Processing of data –** Following collection and storage, the data analyst 'cleans' the raw data by checking it for misspellings, irrelevancies, duplicates, formatting, and bias. In this stage, the data analyst may also convert the raw data into a format suitable for analysis by certain applications, such as Microsoft Excel or Structured Query Language ("SQL").

4) **Analysis of data –** Once the raw data is appropriately processed, the data analyst assesses the raw data to identify patterns and insights therefrom. Analysis of data may involve performing calculations and comparing data for better results. In this stage, certain data analysis software and/or programming languages are used, such as Excel, SQL, Python, and the R-language.

5) **Dissemination of data –** Upon analyzing the raw data, the data analyst performs "visualizations" of his or her analyses. To 'visualize' analyses, the data analyst will use specialized software to create graphs and/or charts illustrating the analyst's findings. The data analyst will share the finalized visualizations with stakeholders for informed decision-making.

6) **Acting on the data** – Considering the data analyst's visualized findings about the issue assessed by the analyst, stakeholders will then decide what action to take.

117.   Data analytics can be performed in-house (by the organization itself) or outsourced to companies specializing in data analytics.[8]

118.   An organization may choose to outsource its data analytics needs to a third-party data analytics company because of, among other motives, the cost and time required to maintain an internal data analytics team.

119.   In the instant case, Defendant Dollar Tree outsourced its data analytics needs to Defendant Zeroed-In by utilizing Zeroed-In's human resources data analysis software.

## B. Defendant Zeroed-In's Data Collection Practices

120.   Defendant Zeroed-In collects PII contained by its 'customers' "for hosting and processing purposes in connection with a subscription to [Zeroed-In's] products or services . . . ."[9]

121.   Dollar Tree was a customer of Zeroed-In's data analytics software products or services.

---

[8] *Advantages of outsourcing data analytics*, OP360,
https://www.op360.com/blog/outsourcing-data-analytics/ (last visited Jan. 17, 2024).
[9] *Privacy Policy*, Zeroed-In Technologies, https://www.zeroedin.com/privacy-policy/.

122.    As Dollar Tree's third-party vendor for human resources data analytics services, Defendant Zeroed-In collected from Dollar Tree the PII of Dollar Tree's current and/or former employees, including but not limited to names, birth dates, and/or SSNs.

123.    Defendant Zeroed-In specifies in its Privacy Policy that it uses collected PII "to perform the services requested by the user[,] . . . for marketing purposes[,] . . ." and to manage and ameliorate the webpages through which Zeroed-In operates and collects data, facilitate the utilization of such webpages, and "track aggregate traffic patterns throughout" such webpages.[10]

## C. The Data Breach

124.    On August 8, 2023, Defendant Zeroed-In detected strange activity on its network systems, prompting Defendant to investigate the activity.[11]

125.    From the investigation, Zeroed-In concluded that an unauthorized actor gained access to certain of Zeroed-In's systems between August 7 and August 8, 2023.[12]

---

[10] *Id.*
[11] *Data Breach Notifications*, Office of the Maine Atty. General, https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last visited Jan. 17, 2024), click hyperlink to "Notice of Data Event - Zeroed In - ME.pdf**.**"
[12] *Id.*

126.   Defendant Zeroed-In asserted that it was able to determine which of its systems were accessed but stated that it could not determine which files contained therein were accessed.[13]

127.   Thus, Zeroed-In conducted a "review" of its systems' contents to pinpoint what data was present during the data security event.[14]

128.   Upon conclusion of the "review" of its systems on August 31, 2023, Zeroed-In determined that the following data types were compromised: names, birth dates, and/or SSNs.[15]

129.   Both Dollar Tree and Family Dollar were included as Defendant Zeroed-In clients affected by the Data Breach.[16]

130.   Upon information and belief, the PII of about 1.97 million individuals was affected by the Data Breach.[17]

131.   Upon information and belief, the PII collected by Dollar Tree, provided to Zeroed-In, and compromised by the Data Breach is that of current and/or former employees of Dollar Tree.[18]

---

[13] *Id.*
[14] *Id.*
[15] *Id.*
[16] *Id.*
[17] *Data Breach Notifications*, Office of the Maine Atty. General, https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last visited Jan. 17, 2024).
[18] *See Dollar Tree confirms significant data breach*, TechRadar, https://www.techradar.com/pro/security/dollar-treedata-breach-could-affect-millions-of-customers (last visited Jan. 17, 2024) (reporting that a spokesperson for Defendant Dollar Tree stated that Defendant Zeroed-In provided notice of the Data Breach to current and former employees of Dollar Tree and Family Dollar).

132.    On November 27, 2023, Defendant Zeroed-In uploaded a "Notice of Data Event" letter on the Maine Attorney General website, notifying Maine residents of the Data Breach.[19] Zeroed-In also sent a similar notice letter to impacted individuals (the "Notice Letter").

133.    Omitted from the Notice Letter are the details of the root cause of the Data Breach, the vulnerabilities exploited, and the specific remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs or class members, who retain a vested interest in ensuring that their PII remains protected.

134.    Thus, Defendants' "disclosure" of the Data Breach amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and class members of the Data Breach's critical facts. Without these details, Plaintiffs' and class members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

135.    Defendants did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and class members, causing the exposure of PII, such as encrypting the information or deleting it when it is no longer needed. Moreover, Dollar Tree failed to exercise due diligence in selecting its vendor(s) or deciding with whom they would share sensitive employee PII.

---

[19] *Data Breach Notifications*, Office of the Maine Atty. General, https://apps.web.maine.gov/online/aeviewer/ME/40/b3993ddd-2443-4645-ae45-f36dc7686236.shtml (last visited Jan. 17, 2024).

136.    The attacker accessed and acquired files containing unencrypted PII of Plaintiffs and class members, including their names, dates of birth, and Social Security numbers. Plaintiffs' and class members' PII was accessed and stolen in the Data Breach.

137.    Plaintiffs further believe their PII, and that of class members, was subsequently sold on the dark web following the Data Breach, as that is the modus operandi of cybercriminals that commit cyber-attacks of this type. Moreover, following the Data Breach, Plaintiffs experienced fraudulent misuse of their compromised information that would support this well-founded belief.

### D. The Value of PII

138.    In April 2020, ZDNet reported in an article titled "Ransomware mentioned in 1,000+ SEC filings over the past year", that "r]ansomware gangs are now ferociously aggressive in their pursuit of big companies. They breach networks, use specialized tools to maximize damage, leak corporate information on dark web portals, and even tip journalists to generate negative news for complaints as revenge against those who refuse to pay."[20]

139.    In September 2020, the United States Cybersecurity and Infrastructure Security Agency published online a "Ransomware Guide" advising that "[m]alicious actors have adjusted their ransomware tactics over time to include pressuring victims for payment by threatening to release stolen

---

[20] https://www.zdnet.com/article/ransomeware-mentioned-in-1000-sec-filings-over-the-past-year/ (last visited Jan. 17, 2024).

data if they refuse to pay and publicly naming and shaming victims as secondary forms of extortion."[21]

140.   Stolen PII is often trafficked on the dark web, as is the case here. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity.

141.   When malicious actors infiltrate companies and copy and exfiltrate the PII that those companies store, that stolen information often ends up on the dark web because the malicious actors buy and sell that information for profit.[22]

142.   Another example is when the U.S. Department of Justice announced its seizure of AlphaBay in 2017, AlphaBay had more than 350,000 listings, many of which concerned stolen or fraudulent documents that could be used to assume another person's identity. Other marketplaces, similar to the now-defunct AlphaBay, "are awash with [PII] belonging to victims from countries all over the world. One of the key challenges of protecting PII online is its pervasiveness. As data breaches in the news continue to show, PII about employees, customers and the public is housed in all kinds of organizations, and the increasing digital transformation of today's businesses only broadens the number of potential sources for hackers to target."[23]

---

[21] *See* https://www.cisa.gov/sites/default/files/2023-01-CISA_MS
ISAC_Ransomware%20Guide_8508C.pdf (last visited Jan. 17, 2024).
[22] *Shining a Light on the Dark Web with Identity Monitoring, IdentityForce*, Dec. 28, 2020, available at: https://www.identityforce.com/blog/shining-light-dark-web-identity- monitoring (last visited Jan. 17, 2024).
[23] *Stolen PII & Ramifications: Identity Theft and Fraud on the Dark Web*, Armor, April 3, 2018, available at:

143. The PII of consumers remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[24] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[25] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[26]

144. Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally

---

https://www.armor.com/resources/blog/stolen-pii- ramifications- identity-theft-fraud-dark-web/ (last visited Jan. 17, 2024).

[24] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal- data-sold-on-the-dark-web- how-much-it-costs/ (last visited Jan. 17, 2024).

[25] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask- experian/heres-how-much-your-personal-information-is- selling-for-on-the-dark-web/ (last visited Jan. 17, 2024).

[26] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous- browsing/in-the- dark/ (last visited Jan. 17, 2024).

using your Social Security number and assuming your identity can cause a lot of problems.[27]

145.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

146.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[28]

147.    Because of this, the information compromised in the Data Breach here is significantly more harmful to lose than other types of data because the information compromised in this Data Breach is difficult, if not impossible, to change.

148.    The PII compromised in the Data Breach also demands a much higher price on the black market. Martin Walter, senior director at

---

[27] Social Security Administration, *Identity Theft and Your Social Security Number*, *available at*: https://www.ssa.gov/pubs/EN-05-10064.pdf (last visited Jan. 17, 2024).
[28] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), *available at*: http://www.npr.org/2015/02/09/384875839/data-stolen- by-anthem-s-hackers-has- millionsworrying- about-identity-theft (last visited Jan. 17, 2024).

cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10 times on the black market."[29]

149.   Once PII is sold, it is often used to gain access to various areas of the victim's digital life, including bank accounts, social media, credit card, and tax details. This can lead to additional PII being harvested from the victim, as well as PII from family, friends and colleagues of the original victim.

150.   According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses in 2019, resulting in more than $3.5 billion in losses to individuals and business victims.

151.   Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

152.   Data breaches facilitate identity theft as hackers obtain consumers' PII and thereafter use it to siphon money from current accounts, open new accounts in the names of their victims, or sell consumers' PII to others who do the same.

---

[29] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*:
https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells- for-10x- price-of-stolen-credit-card-numbers.html (last visited Jan. 17, 2024).

153.    For example, the United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that criminals use PII to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name.[30] The GAO Report further notes that this type of identity fraud is the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime. The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[31]

154.    The exposure of Plaintiffs' and class members' PII to cybercriminals will continue to cause substantial risk of future harm (including identity theft) that is continuing and imminent in light of the many different avenues of fraud and identity theft utilized by third-party cybercriminals to profit off of this highly sensitive information.

## E.  Defendants Failed to Comply with the FTC Act and Failed to Observe Reasonable and Adequate Date Security Measures

155.    The FTC has issued several guides for businesses, highlighting the importance of reasonable data security practices. According to the FTC, the need for data security should be considered for all business decision-making.[32]

---

[30] *See* Government Accountability Office, *Personal Information: Data Breaches are Frequent, but Evidence of Resulting Identity Theft is Limited; However, the Full Extent is Unknown* (June 2007), https://www.gao.gov/assets/gao- 07-737.pdf (last visited Jan. 17, 2024).
[31] *Id.*
[32] *Start With Security*, Fed. Trade Comm'n ("FTC"), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf

156.    Under the FTC's 2016 *Protecting Personal Information: Guide for Business* publication, the FTC notes that businesses should safeguard the personal customer information they retain; properly dispose of unnecessary personal information; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to rectify security issues.[33]

157.    The guidelines also suggest that businesses use an intrusion detection system to expose a breach as soon as it happens, monitor all incoming traffic for activity indicating someone is trying to hack the system, watch for large amounts of data being siphoned from the system, and have a response plan in the event of a breach.

158.    The FTC advises companies to not keep information for periods of time longer than needed to authorize a transaction, restrict access to private information, mandate complex passwords to be used on networks, utilize industry-standard methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[34]

---

[33]*Protecting Personal Information: A Guide for Business*, FTC, available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf (last visited Jan. 17, 2024).

[34] *Start With Security*, Fed. Trade Comm'n ("FTC"), available at https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last visited Jan. 17, 2024).

159.    The FTC has brought enforcement actions against companies for failing to adequately and reasonably protect consumer data, treating the failure to do so as an unfair act or practice barred by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders originating from these actions further elucidate the measures businesses must take to satisfy their data security obligations.

160.    Defendant Zeroed-In's failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

161.    Dollar Tree's failure to verify that Zeroed-In, a third-party service provider, had implemented reasonable security measures constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

162.    Plaintiffs and class members gave their PII to Dollar Tree with the reasonable expectation and understanding that Dollar Tree would comply with its duty to keep such information confidential and secure from unauthorized access.

163.    Defendant Zeroed-In stated in its Privacy Policy conflicting terms and conditions that it would safeguard PII without guaranteeing security:

**SECURITY**

We employ robust security measures to protect against the loss, misuse and alternation of the personal information under our control. The [webpages through which Zeroed-In operates and collects data] employ Secure Socket Layer (SSL) technology using both server authentication and data encryption. The [webpages through which Zeroed-In operates and collects data] are hosted in a secure server environment that uses firewalls, intrusion detection systems, and other advanced technology to protect against interference or access from outside intruders.

However, no method of transmission over the Internet, or method of electronic storage, is 100% secure. Therefore, *we cannot guarantee absolute security*. It is your responsibility to ensure you are accessing the [webpages through which Zeroed-In operates and collects data] and Service Platform using an up-to-date web browser. You are also responsible for maintaining the security and confidentiality of any usernames and passwords associated with the [webpages through which Zeroed-In operates and collects data].

*Keeping your personal information secure is our first priority*.[35]

164.    Defendants have been on notice for years that Plaintiffs' and class members' PII was a target for bad actors because of, among other motives, the high value of the PII created, collected, and maintained by Defendants.

165.    Despite such awareness, Defendants failed to impose and maintain reasonable and appropriate data security controls to protect Plaintiffs' and class members' PII from unauthorized access that Defendants should have anticipated and guarded against.

---

[35] *Privacy Policy*, Zeroed-In Technologies, https://www.zeroedin.com/privacy-policy/ (last visited Jan. 17, 2024).

166.    Defendant Zeroed-In was fully aware of its obligation to protect the PII of its customers because of its collection, storage, and maintenance of PII. Defendant Zeroed-In was also aware of the significant consequences that would ensue if it failed to do so because it collected, stored, and maintained sensitive private information from millions of individuals and knew that this information, if hacked, would result in injury to Plaintiffs and class members.

167.    Dollar Tree was also fully aware of its obligation to protect the PII of its current and former employees because of its collection, storage, and maintenance of PII. Dollar Tree was aware of the significant consequences that would ensue if it failed to do so because it collected, stored, and maintained sensitive private information from thousands of individuals and  knew that this information, if hacked, would result in injury to Plaintiffs and class members.

168.    Despite understanding the consequences of insufficient data security, Defendants failed to adequately protect Plaintiffs' and class members' PII, permitting bad actors to access and misuse it.

**F.  Defendants Failed to Comply with Industry Standards**

169.    Various cybersecurity industry best practices have been published and should be consulted as a go-to resource when developing an organization's cybersecurity standards. The Center for Internet Security ("CIS") promulgated its Critical Security Controls, which identify the most commonplace and essential

cyber-attacks that affect businesses every day and proposes solutions to defend against those cyber-attacks.[36] All organizations collecting and handling PII, such as Defendants, are strongly encouraged to follow these controls.

170.    Further, the CIS Benchmarks are the overwhelming option of choice for auditors worldwide when advising organizations on the adoption of a secure build standard for any governance and security initiative, including PCI DSS, HIPAA, NIST 800-53, SOX, FISMA, ISO/IEC 27002, Graham Leach Bliley and ITIL.[37]

171.    Cybersecurity experts normally have identified data management companies, like Defendant Zeroed-In, as being particularly vulnerable to cyberattacks because of the value of the PII which they collect, use, and maintain.[38]

172.    Several best practices have been identified that a minimum should be implemented by data management companies like Defendant Zeroed-In, including but not limited to securely configuring business software, managing access controls and vulnerabilities to networks, systems, and software,

---

[36] Center for Internet Security, *Critical Security Controls*, at 1 (May 2021), available at https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Jan. 17, 2024).
[37] *See CIS Benchmarks FAQ*, Center for Internet Security, https://www.cisecurity.org/cis-benchmarks/cis-benchmarks-faq/ (last visited Jan. 17, 2024).
[38] *See Security Questions to Ask After the ZeroedIn Breach*, Information Week, https://www.informationweek.com/cyber-resilience/security-questions-to-ask-after-the-zeroedin-breach (last visited Jan. 17, 2024) (commenting that the growing outsourcing of data analytics work to third-party service providers may offer to malicious cyber-attackers novel "targets of opportunity – breach one data manager and gain access to data from a multitude of sources.).

maintaining network infrastructure, defending networks, adopting data encryption while data is both in transit and at rest, and securing application software.[39]

173.    Other best practices have been identified that a minimum should be implemented by companies like Dollar Tree using third-party providers, including but not limited to ensuring that PII is only shared with third parties when reasonably necessary and that those vendors have appropriate cybersecurity systems and protocols in place.[40]

174.    Defendants failed to follow these and other industry standards to adequately protect the PII of Plaintiffs and class members.

**G. The Data Breach Caused Harm and Will Result in Additional Fraud**

175.    Without detailed disclosure to the victims of the Data Breach, individuals whose PII was compromised by the Data Breach, including Plaintiffs and class members, were unknowingly and unwittingly exposed to continued misuse and ongoing risk of misuse of their PII for months without being able to take available precautions to prevent imminent harm.

176.    The ramifications of Defendant Zeroed-In's failure to secure Plaintiffs' and class members' data are severe.

---

[39] *See* Center for Internet Security, *Critical Security Controls* (May 2021), available at https://learn.cisecurity.org/CIS-Controls-v8-guide-pdf (last visited Jan. 17, 2024).
[40] *See id.*

177.   Victims of data breaches are much more likely to become victims of identity theft and other types of fraudulent schemes. This conclusion is based on an analysis of four years of data that correlated each year's data breach victims with those who also reported being victims of identity fraud.

178.   The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[41]  The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person."[42]

179.   Identity thieves can use PII, such as that of Plaintiffs and class members, which Defendants failed to keep secure, to perpetrate a variety of crimes that harm victims. For instance, identity thieves may commit various types of government fraud such as: immigration fraud; obtaining a driver's license or identification card in the victim's name but with another's picture; using the victim's information to obtain government benefits; or filing a fraudulent tax return using the victim's information to obtain a fraudulent refund.

180.   As demonstrated herein, these and other instances of fraudulent misuse of the compromised PII has already occurred and are likely to continue.

---

[41] 17 C.F.R § 248.201 (2013).
[42] *Id.*

181.    As a result of Defendant Zeroed-In's delay between the Data Breach in August and the notice of the Data Breach sent to affected persons in November, the risk of fraud for Plaintiffs and class members increased exponentially.

182.    Javelin Strategy and Research reports that identity thieves have stolen $112 billion in the past six years.[43]

183.    Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. After conducting a study, the Department of Justice's Bureau of Justice Statistics ("BJS") found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[44]

184.    There may be a time lag between when harm occurs versus when it is discovered, and also between when private information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result,

---

[43] *See* https://www.javelinstrategy.com/coverage-area/2016-identity-fraud-fraud-hits-inflection-point (last visited Jan. 17, 2024).

[44] *Victims of Identity Theft*, Bureau of Justice Statistics (Sept. 2015) available at: http://www.bjs.gov/content/pub/pdf/vit14.pdf (last visited Jan. 17, 2024).

studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[45]

185.    Thus, Plaintiffs and class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights.

### H. Plaintiffs and Class Members Suffered Damages

186.    The Data Breach was a direct and proximate result of Defendants' failure to properly safeguard and protect Plaintiffs' and class members' PII from unauthorized access, use, and disclosure, as required by various state and federal regulations, industry practices, and the common law, including (a) Defendant Zeroed-In's failure to establish and implement appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of Plaintiffs' and class members' PII to protect against reasonably foreseeable threats to the security or integrity of such information; and (b) Dollar Tree's failure to verify that Zeroed-In, Dollar Tree's third-party vendor for data analytics services, had imposed reasonable security measures.

187.    Had Defendants remedied the deficiencies in their information storage and security systems, followed industry guidelines, and adopted security measures recommended by experts in the field, they would have prevented

---

[45] GAO, *Report to Congressional Requesters*, at 29 (June 2007), available at http://www.gao.gov/new.items/d07737.pdf (last visited Jan. 17, 2024).

intrusion into its information storage and security systems and, ultimately, the theft of the PII of over 1.97 million individuals.

188.   As a direct and proximate result of Defendants' wrongful actions and inaction and the resulting Data Breach, Plaintiffs and class members have already been harmed by the fraudulent misuse of their PII, and have been placed at an imminent, immediate, and continuing increased risk of additional harm from identity theft and identity fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate both the actual and potential impact of the Data Breach on their lives. Such mitigatory actions include, *inter alia*, placing "freezes" and "alerts" with credit reporting agencies, contacting their financial institutions, closing or modifying financial accounts, closely reviewing and monitoring their credit reports and accounts for unauthorized activity, sorting through dozens of phishing and spam email, text, and phone communications, and filing police reports. This time has been lost forever and cannot be recaptured.

189.   Defendants' wrongful actions and inaction directly and proximately caused the theft and dissemination into the public domain of Plaintiffs' and class members' PII, causing them to suffer, and continue to suffer, economic damages and other actual harm for which they are entitled to compensation, including:

    a.   theft and misuse of their personal and financial information;

b.  the imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII being placed in the hands of criminals and misused via the sale of Plaintiffs' and class members' information on the Internet's black market;

c.  the untimely and inadequate notification of the Data Breach;

d.  the improper disclosure of their PII;

e.  loss of privacy;

f.  ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably incurred to remedy or mitigate the effects of the Data Breach;

g.  ascertainable losses in the form of deprivation of the value of their PII, for which there is a well-established national and international market; and,

h.  the loss of productivity and value of their time spent to address, attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach, including finding fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposition of withdrawal and purchase limits on compromised accounts, and the inconvenience,

nuisance and annoyance of dealing with all such issues resulting from the Data Breach.

190.   While Plaintiffs' and class members' PII has been stolen, Defendant Zeroed-In continues to hold Plaintiffs' and class members' PII. Particularly because Defendants have demonstrated an inability to prevent a breach or stop it from continuing even after being detected, Plaintiffs and class members have an undeniable interest in ensuring that their PII is secure, remains secure, is properly and promptly destroyed, and is not subject to further theft.

**CLASS ALLEGATIONS**

191.   Plaintiffs bring this class action individually on behalf of themselves and on behalf of all members of the following classes of similarly situated persons pursuant to Federal Rule of Civil Procedure 23. Plaintiffs seek certification under Fed. R. Civ. P. 23(a), (b)(2), and (b)(3) of the following classes:

**Nationwide Class**

All persons residing in the United States whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

**Florida Class**

All persons residing in the state of Florida whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

**Georgia Class**

All persons residing in the state of Georgia whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

### Illinois Class

All persons residing in the state of Illinois whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

### Maryland Class

All persons residing in the state of Maryland whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

### Missouri Class

All persons residing in the state of Missouri whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

### New York Class

All persons residing in the state of New York whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

### South Carolina Class

All persons residing in the state of South Carolina whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

### Texas Class

All persons residing in the state of Texas whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

### Virginia Class

All persons residing in the Commonwealth of Virginia whose PII was compromised in the Data Breach, including all who were sent a notice of the Data Breach.

192.   Excluded from the class are Defendants and their affiliates, parents,

subsidiaries, officers, agents, and directors, any entities in which Defendants have

a controlling interest, as well as the judge(s) presiding over this matter and the clerks, judicial staff, and immediate family members of said judge(s).

193.    Plaintiffs reserve the right to modify or amend the foregoing class definitions before the Court determines whether certification is appropriate.

194.    <u>Numerosity:</u> The members in the class are so numerous that joinder of all class members in a single proceeding would be impracticable. As noted above, it has been reported that approximately 1.977 million individuals' information was exposed in the Data Breach.

195.    <u>Commonality and Predominance:</u> Common questions of law and fact exist as to all class members and predominate over any potential questions affecting only individual class members. These common questions of law or fact include, *inter alia*:

> a.    Whether Defendants engaged in the conduct alleged herein;
>
> b.    Whether Defendants had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiffs' and class members' PII from unauthorized access and disclosure;
>
> c.    Whether Defendants' computer systems and data security practices used to protect Plaintiffs' and class members' PII violated the FTC Act and/or state laws, and/or Defendants' other duties discussed herein;

d.   Whether Defendant Zeroed-In failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiffs and class members;

e.   Whether Defendants unlawfully shared, lost, or disclosed Plaintiffs' and class members' PII;

f.   Whether Defendants' data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

g.   Whether Defendants' data security systems prior to and during the Data Breach were consistent with industry standards;

h.   Whether Plaintiffs and class members suffered injury as a proximate result of Defendants' negligent actions or failures to act;

i.   Whether Defendants failed to exercise reasonable care to secure and safeguard Plaintiffs' and class members' PII;

j.   Whether Defendants breached duties to protect Plaintiffs' and class members' PII;

k.   Whether Defendants' actions and inactions alleged herein were negligent;

48

l.   Whether Defendants were unjustly enriched by their conduct as alleged herein;

m.   Whether an implied contract existed between class members and Defendants with respect to protecting PII and privacy, and whether that contract was breached;

n.   Whether Plaintiffs and class members are entitled to actual and/or statutory damages or other relief, and the measure of such damages and relief;

o.   Whether Plaintiffs and class members are entitled to additional credit or identity monitoring and monetary relief; and

p.   Whether Plaintiffs and class members are entitled to equitable relief, including injunctive relief, restitution, disgorgement, and/or the establishment of a constructive trust.

196.   Defendants engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiffs on behalf of themselves and all other class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

197.   Typicality: Plaintiffs' claims are typical of the claims of the class. Plaintiffs, like all proposed members of the class, had their PII compromised in the Data Breach. Plaintiffs and class members were injured by the same wrongful acts, practices, and omissions committed by Defendants, as described herein. Plaintiffs'

claims therefore arise from the same practices or course of conduct that give rise to the claims of all class members.

198.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the class members. Plaintiffs are adequate representatives of the class and have no interests adverse to, or conflict with, the class(es) they seek to represent. Plaintiffs have retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

199.    Superiority: A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiffs and all other class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, so it would be impracticable for class members to individually seek redress from Defendants' wrongful conduct. Even if class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

200.    Injunctive and Declaratory Relief: Defendants have acted and/or refused to act on grounds generally applicable to the class such that final injunctive

relief and/or corresponding declaratory relief is appropriate as to the class as a whole.

201.   All members of the proposed class are readily ascertainable. Defendants have access to the names in combination with addresses and/or e-mail addresses of class members affected by the Data Breach. Indeed, impacted class members already have been preliminarily identified and sent a breach notice letter.

**COUNT I**
**NEGLIGENCE AND NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Classes, as Against Zeroed-In)**

202.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

203.   Zeroed-In's clients, including Dollar Tree, require their employees to submit non-public PII as a condition of employment.

204.   Defendant Zeroed-In gathered and stored the PII of Plaintiffs and class members as part of its business, which affects commerce.

205.   Plaintiffs and class members entrusted Defendant Zeroed-In with their PII with the understanding that the information would be safeguarded.

206.   Defendant Zeroed-In had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and class members could and would suffer if their PII were wrongfully disclosed.

207.   By assuming the responsibility to collect and store this data, Zeroed-In had duties of care to use reasonable means to secure and to prevent disclosure of the information, and to safeguard the information from theft.

208.   Zeroed-In had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45 (the "FTC Act"), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

209.   Zeroed-In owed a duty of care to Plaintiffs and class members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

210.   Zeroed-In's duty to use reasonable security measures arose as a result of the special relationship that existed between Zeroed-In, on the one hand, and Plaintiffs and class members, on the other hand. That special relationship arose because Dollar Tree was entrusted with their confidential PII, a necessary part of employment, and Dollar Tree (and possibly other employers) shared the information with Zeroed-In.

211.   Zeroed-In also had a duty to exercise appropriate clearinghouse practices to remove former employees' PII they were no longer required to retain pursuant to regulations.

212.   Moreover, Zeroed-In had a duty to promptly and adequately notify Plaintiffs and the class of the Data Breach, but failed to do so.

213.   Zeroed-In had and continues to have duties to adequately disclose that Plaintiffs' and class members' PII within Zeroed-In's possession might have

been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

214. Zeroed-In breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect Plaintiffs' and class members' PII. The specific negligent acts and omissions committed by Zeroed-In include, but are not limited to, the following:

    i.    Failing to adopt, implement, and maintain adequate security measures to safeguard class members' PII;

    j.    Failing to adequately monitor the security of their networks and systems;

    k.    Allowing unauthorized access to class members' PII;

    l.    Failing to detect in a timely manner that class members' PII had been compromised;

    m.    Failing to remove former employees' PII they were no longer required to retain pursuant to regulations; and

    n.    Failing to timely and adequately notify class members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

215.   Zeroed-In violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Zeroed-In's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the damages that would result to Plaintiffs and class members.

216.   Plaintiffs and class members were within the class of persons the provisions of the FTC Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm the statutes were intended to guard against.

217.   Zeroed-In's violation of Section 5 of the FTC Act constitutes negligence *per se*.

218.   The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

219.   A breach of security, unauthorized access, and resulting injury to Plaintiffs and the class was reasonably foreseeable, particularly in light of Zeroed-In's inadequate security practices.

220.   It was foreseeable that Zeroed-In's failure to use reasonable measures to protect class members' PII would result in injury to class members. Further, the

breach of security was reasonably foreseeable given the known high frequency of corporate cyberattacks and data breaches.

221.   Zeroed-In had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the class could and would suffer if the PII were wrongfully disclosed.

222.   Plaintiffs and the class were the foreseeable and probable victims of any inadequate security practices and procedures. Zeroed-In knew or should have known of the inherent risks in collecting and storing PII, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on its systems.

223.   It was foreseeable that Zeroed-In's failure to adequately safeguard PII would result in one or more types of injuries to class members.

224.   Plaintiffs and the class had no ability to protect their PII that was in, and possibly remains in, Zeroed-In's possession.

225.   Zeroed-In was in a position to protect against the harm suffered by Plaintiffs and the class as a result of the Data Breach.

226.   Zeroed-In's duties extended to protecting Plaintiffs and the class from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts

§ 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

227.   Zeroed-In has admitted that the PII of Plaintiffs and the class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

228.   But for Zeroed-In's wrongful and negligent breaches of duties owed to Plaintiffs and the class, Plaintiffs' and class members' PII would not have been compromised.

229.   There is a close causal connection between Zeroed-In's failure to implement security measures to protect Plaintiffs' and class members' PII, and the harm, or risk of imminent harm, suffered by Plaintiffs and the class. PII was lost and accessed as the proximate result of Zeroed-In's failure to exercise reasonable care by adopting, implementing, and maintaining appropriate security measures.

230.   As a direct and proximate result of Zeroed-In's negligence, Plaintiffs and the class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Zeroed-In's possession and is subject to further

unauthorized disclosures so long as Zeroed-In fails to undertake appropriate and adequate measures to protect the PII.

231. As a direct and proximate result of Zeroed-In's negligence, Plaintiffs and the class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

232. Additionally, as a direct and proximate result of Zeroed-In's negligence, Plaintiffs and the class have suffered and will suffer the continued risks of exposure of their PII, which remain in Zeroed-In's possession and is subject to further unauthorized disclosures so long as Zeroed-In fails to undertake appropriate and adequate measures to protect the PII in its continued possession.

233. Plaintiffs and class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

234. Zeroed-In's negligent conduct is ongoing, in that it still possesses Plaintiffs' and class members' PII in an unsafe and insecure manner.

235. Plaintiffs and class members are entitled to injunctive relief requiring Zeroed-In to: (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all class members.

**COUNT II**
**NEGLIGENCE AND NEGLIGENCE *PER SE***
**(On Behalf of Plaintiffs and the Classes, as Against Dollar Tree)**

236.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

237.   Dollar Tree engaged Zeroed-In for human resources analytics and shared its employees'—i.e., Plaintiffs' and class members'—nonpublic PII with Zeroed-In.

238.   Dollar Tree had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and class members could and would suffer if the PII was wrongfully disclosed.

239.   By assuming the responsibility to collect and store this data, Dollar Tree had duties of care to Plaintiffs and class members to use reasonable means to secure and to prevent disclosure of the information entrusted to it, and to safeguard the information from theft.

240.   Dollar Tree had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

241.   Dollar Tree owed a duty of care to Plaintiffs and class members as their employer to provide data security consistent with industry standards and

other requirements discussed herein, and to ensure that their systems and networks, and the personnel responsible for them, adequately protected the PII.

242.   Dollar Tree's duty to use reasonable security measures arose as a result of the special relationship that existed between it, on the one hand, and Plaintiffs and class members, on the other hand. That special relationship arose because Plaintiffs and the class entrusted Dollar Tree with their confidential PII, a necessary part of employment with Dollar Tree.

243.   Dollar Tree also had a duty to exercise appropriate clearinghouse practices to remove former employees' PII they were no longer required to retain pursuant to regulations.

244.   Moreover, Dollar Tree had a duty to promptly and adequately notify Plaintiffs and the class of the Data Breach, which it failed to do.

245.   Dollar Tree had and continues to have duties to adequately disclose that Plaintiffs' and class members' PII within Zeroed-In's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and class members to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their PII by third parties.

246.   Dollar Tree breached its duties, pursuant to the FTC Act and other applicable standards, and thus was negligent, by failing to use reasonable measures to protect class members' PII with which it was entrusted. The specific negligent

acts and omissions committed by Dollar Tree include, but are not limited to, the following:

    a.    Failing to adequately vet, audit, monitor, or ensure the integrity of vendor data security practices;

    b.    Allowing unauthorized access to class members' PII;

    c.    Failing to keep class members' PII in encrypted format;

    d.    Failing to remove former employees' PII that was no longer required to be retained pursuant to regulations; and

    e.    Failing to timely and adequately notify class members about the Data Breach and its scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

247.   Dollar Tree violated Section 5 of the FTC Act by failing to use reasonable measures to protect PII and not complying with applicable industry standards, as described in detail herein. Dollar Tree's conduct was particularly unreasonable given the nature and amount of PII it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the class.

248.   Plaintiffs and class members were within the class of persons the provisions of the FTC Act were intended to protect and the type of harm that resulted from the Data Breach was the type of harm it was intended to guard against.

249. Dollar Tree's violation of Section 5 of the FTC Act constitutes negligence *per se*.

250. The FTC has pursued enforcement actions against businesses, which, as a result of their failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the class.

251. A breach of security, unauthorized access, and resulting injury to Plaintiffs and the class was reasonably foreseeable, particularly in light of Zeroed-In's inadequate security practices.

252. It was foreseeable that Dollar Tree's failure to use reasonable measures to protect class members' PII would result in injury to class members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches at large corporations.

253. Dollar Tree had full knowledge of the sensitivity of the PII and the types of harm that Plaintiffs and the class could and would suffer if the PII was wrongfully disclosed.

254. Plaintiffs and the class were the foreseeable and probable victims of any inadequate security practices and procedures. Dollar Tree knew or should have known of the inherent risks in collecting and storing the PII and providing sensitive PII to vendors who do not adequately protect the data, the critical importance of providing adequate security of that PII, and the necessity for encrypting PII stored on its systems.

255.   It was therefore foreseeable that the failure to adequately safeguard class members' PII, and placing PII in the hands of a vendor that does not adequately safeguard PII, would result in one or more types of injuries to class members.

256.   Plaintiffs and the class had no ability to protect their PII that was in, and possibly remains in, Dollar Tree's possession, and which Dollar Tree handed over to Zeroed-In.

257.   Dollar Tree was in a position to protect against the harm suffered by Plaintiffs and the class as a result of the Data Breach, including through properly vetting its vendors to ensure such vendors adequately protect PII.

258.   Dollar Tree's duties extended to protecting Plaintiffs and the class from the risk of foreseeable criminal conduct of third parties, which have been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

259.   But for Dollar Tree's wrongful and negligent breaches of duties owed to Plaintiffs and the class, the PII of Plaintiffs and the class would not have been compromised.

260.   There is a close causal connection between Dollar Tree's failure to ensure the protection of Plaintiffs' and class members' PII, and the harm or risk of

imminent harm suffered by Plaintiffs and the class. Plaintiffs' and class members' PII was lost and accessed as the proximate result of Dollar Tree's failure to exercise reasonable care in ensuring that PII is adequately safeguarded.

261.   As a direct and proximate result of Dollar Tree's negligence, Plaintiffs and the class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Dollar Tree's possession and is subject to further unauthorized disclosures so long as Dollar Tree fails to undertake appropriate and adequate measures to protect the PII.

262.   As a direct and proximate result of Dollar Tree's negligence, Plaintiffs and the class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

263.   Additionally, as a direct and proximate result of Dollar Tree's negligence, Plaintiffs and the class have suffered and will suffer the continued risks of exposure of their PII.

264.   Plaintiffs and class members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

265.   Dollar Tree's negligent conduct is ongoing, in that it still holds or permits third parties to hold the PII of Plaintiffs and class members in an unsafe and insecure manner.

266.   Plaintiffs and class members are also entitled to injunctive relief requiring Dollar Tree to: (i) strengthen its data security systems and monitoring procedures; (ii) evaluate, audit, and improve its processes for vetting third party vendors and the selection processes for vendors to which Dollar Tree provides sensitive PII; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) continue to provide adequate credit monitoring to all class members.

<u>**COUNT III**</u>
**BREACH OF IMPLIED CONTRACT**
**(On Behalf of Plaintiffs and the Classes, as Against Dollar Tree)**

267.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

268.   Plaintiffs and class members were required to provide their PII to Dollar Tree as a condition of receiving employment.

269.   Plaintiffs and class members entrusted their PII to Dollar Tree. In doing so, Plaintiffs and the class entered into implied contracts with Dollar Tree by which Dollar Tree agreed to safeguard and protect such information to keep such

information secure and confidential, and to timely and accurately notify Plaintiffs and the class if their data had been breached and compromised or stolen.

270. In entering into the implied contracts, Plaintiffs and class members reasonably believed and expected that Dollar Tree's data security practices complied with relevant laws and regulations and were consistent with industry standards, and that Dollar Tree would thoroughly vet and select vendors that adequately protect PII.

271. Implicit in the agreement between Plaintiffs and class members and Dollar Tree was Dollar Tree's obligation to: (a) take reasonable steps to safeguard that PII, including through proper vetting of third party vendors to whom PII is provided; (b) prevent unauthorized disclosure of the PII; (c) provide Plaintiffs and class members with prompt and sufficient notice of any and all unauthorized access and/or theft of their PII; (d) reasonably safeguard and protect the PII of Plaintiffs and class members from unauthorized disclosure or uses; and (e) retain or allow third parties to retain PII only under conditions that kept such information secure and confidential.

272. The mutual understanding and intent of Plaintiffs and class members on the one hand, and Dollar Tree on the other, is demonstrated by their conduct and course of dealing. Dollar Tree required Plaintiffs and class members to provide their PII as a condition of employment. Plaintiffs and class members accepted the offers for employment and provided their PII.

273.   In accepting the PII, Dollar Tree understood and agreed that they were required to reasonably safeguard and otherwise ensure protection of the PII from unauthorized access or disclosure.

274.   Plaintiffs and class members would not have entrusted their PII to Dollar Tree in the absence of the implied contract between them and Dollar Tree that Dollar Tree would keep, and require the third-party vendors it selects to house PII to keep, their PII reasonably secure.

275.   Plaintiffs and class members would not have entrusted their PII to Dollar Tree in the absence of their implied promise to monitor and ensure that the PII entrusted to it would remain protected by reasonable data security measures and remain confidential, either in Dollar Tree's hands or the hands of its vendor, Zeroed-In.

276.   Plaintiffs and class members fully and adequately performed their obligations under the implied contracts with Dollar Tree by providing their PII at Dollar Tree's request.

277.   Dollar Tree breached the implied contracts made with Plaintiffs and the class by failing to safeguard and protect their PII, by entrusting the PII to a vendor that fails to safeguard PII, by failing to delete the PII of Plaintiffs and the class or requiring vendors to delete information once the relationship ended, and by failing to provide accurate notice to them that their PII was compromised as a result of the Data Breach.

278.   As a direct and proximate result of Dollar Tree's breach of these implied contracts, Plaintiffs and class members sustained damages, as alleged herein, including the loss of the benefit of the bargain.

279.   Plaintiffs and class members are entitled to compensatory, consequential, and nominal damages suffered as a result of the Data Breach.

280.   Plaintiffs and class members are also entitled to injunctive relief requiring Dollar Tree to, e.g., (i) strengthen its data monitoring procedures; (ii) evaluate, audit, and improve its processes for vetting third party vendors and the selection processes for vendors to which Dollar Tree provides sensitive PII; (iii) submit to future annual audits of those systems and monitoring procedures; and (iv) immediately provide or continue providing adequate credit monitoring to all class members.

### COUNT IV
### BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING
### (On Behalf of Plaintiffs and the Classes, as Against Dollar Tree)

281.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

282.   As alleged herein, when Plaintiffs and class members provided their PII to Dollar Tree, they entered into implied contracts where Dollar Tree agreed to comply with its duties and industry standards to protect PII and to timely detect and notify them in the event of a data breach.

283.   Plaintiffs and class members were required to provide their PII in exchange for employment with Dollar Tree, as well as an implied covenant by Dollar Tree to protect Plaintiffs' PII in its possession.

284.   It was clear by these exchanges that the parties intended to enter into an agreement. Plaintiffs and class members would not have disclosed their PII to Dollar Tree but for the prospect of Dollar Tree's promise of employment. Conversely, Dollar Tree presumably would not have taken Plaintiffs' and class members' PII if it did not intend to provide Plaintiffs and class members with the employment it was offering.

285.   Implied in these exchanges was a promise by Dollar Tree to ensure that the PII of Plaintiffs and class members was only used in connection with the agreed-upon employment.

286.   Plaintiffs and class members therefore did not receive the benefit of the bargain with Dollar Tree, because they provided their PII in exchange for an implied agreement by Dollar Tree to keep it safe and secure, whether as housed by Dollar Tree or in connection with providing the PII to a third-party vendor.

287.   While Dollar Tree had discretion in the specifics of how it met the applicable laws and industry standards, this discretion was governed by an implied covenant of good faith and fair dealing.

288.   Dollar Tree breached this implied covenant when it engaged in acts and/or omissions that are declared unfair trade practices by the FTC and state statutes and regulations. These acts and omissions included: omitting,

suppressing, and concealing the material fact of the inadequacy of the privacy and security protections for Plaintiffs' and class members' PII; selection of and providing PII to a vendor that does not adequately safeguard PII;  storing the PII of former employees, despite any valid purpose for the storage thereof having ceased upon the termination of the business relationship with those individuals; and failing to disclose to Plaintiffs and class members at the time they provided their PII to it that Dollar Tree's security systems and those of its vendors, e.g., Zeroed-In, failed to meet applicable legal and industry standards.

289.   Plaintiffs and class members did all or substantially all the significant things that the contract required them to do. Likewise, all conditions required for Dollar Tree's performance were met.

290.   Dollar Tree's acts and omissions unfairly interfered with Plaintiffs' and class members' rights to receive the full benefit of their contracts.

291.   Plaintiffs and class members have been or will be harmed by Dollar Tree's breach of this implied covenant in the numerous ways described above, including actual identity theft and/or imminent risk of certainly impending and devastating identity theft that exists now that cyber criminals have their PII, and the attendant long-term expense of attempting to mitigate and insure against these risks.

292.   Dollar Tree is liable for its breach of these implied covenants, whether or not it is found to have breached any specific express contractual term.

293.   Plaintiffs and class members are entitled to damages, including compensatory damages and restitution, declaratory and injunctive relief, and attorney fees, costs, and expenses.

## COUNT V
## BREACH OF CONFIDENCE
### (On Behalf of Plaintiffs and the Classes, as Against Dollar Tree)

294.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

295.   At all times during Plaintiffs' and class members' interactions with Dollar Tree as its employees, Dollar Tree was fully aware of the confidential and sensitive nature of Plaintiffs' and class members' PII.

296.   Plaintiffs' and class members' PII constitutes confidential and unique information. Indeed, Plaintiffs' and class members' Social Security numbers can be changed only with great difficulty and time spent, which still enables a threat actor to exploit that information during the interim.

297.   As alleged herein, Dollar Tree's relationship with Plaintiffs and class members was governed by terms and expectations that Plaintiffs' and class members' PII would be collected, stored, and protected in confidence—both by Dollar Tree and its vendors to which it provides that PII—and would not be disclosed to unauthorized third parties.

298.   Plaintiffs and class members provided their respective PII to Dollar Tree with the explicit and implicit understandings that it would protect and not permit the PII to be disseminated to any unauthorized parties.

299.   Due to Dollar Tree's failure to protect Plaintiffs' and class members' PII, or retain vendors that protect the PII, Plaintiffs' and class members' PII was disclosed and misappropriated to unauthorized third parties beyond Plaintiffs' and class members' confidence, and without their express permission.

300.   As a direct and proximate cause of Dollar Tree's actions and/or omissions, Plaintiffs and class members have suffered damages as alleged herein.

301.   But for the disclosure of Plaintiffs' and class members' PII, in violation of the parties' mutual understanding of confidence including that Dollar Tree would only provide PII to trusted vendors that adequately safeguard the information, Plaintiffs' and class members' PII would not have been compromised, stolen, viewed, accessed, and used by unauthorized third parties. The Data Breach was the direct and legal cause of the theft of Plaintiffs' and class members' PII, as well as the resulting damages.

302.   The disclosure of Plaintiffs' and class members' PII, and provision of PII to a vendor that does adequately secure PII, constitute violations of Plaintiffs' and class members' understanding that Dollar Tree would safeguard and protect the confidential and unique PII.

303.   The concrete injury and harm that Plaintiffs and class members suffered was the reasonably foreseeable result of Dollar Trees' failure to ensure protection of their PII.

304.   As a direct and proximate result of Dollar Tree's conduct, Plaintiffs and class members have suffered or will suffer concrete injury, including, but not

limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their PII is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII, which remains in both Defendants' possession and is subject to further unauthorized disclosures; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the PII compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiffs and class members.

## COUNT VI
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Classes, as Against Zeroed-In)

305.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

306.   Plaintiffs and class members conferred a monetary benefit on Zeroed-In by providing it, through Zeroed-In's clients, with their valuable PII.

307.   Zeroed-In knew that Plaintiffs and class members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the PII

entrusted to it. Zeroed-In profited from Plaintiffs' retained data and use Plaintiffs' and class members' PII for business purposes.

308. Zeroed-In failed to secure Plaintiffs' and class members' PII and, therefore, did not fully compensate Plaintiffs or class members for the value that their PII provided.

309. Zeroed-In acquired the PII through inequitable record retention as it failed to disclose the inadequate data security practices previously alleged.

310. If Plaintiffs and class members had known Zeroed-In would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, they would not have agreed to the entrustment of their PII to Zeroed-In through its clients, including Dollar Tree.

311. Under the circumstances, it would be unjust for Zeroed-In to be permitted to retain any of the benefits that Plaintiffs and class members conferred upon it.

312. As a direct an proximate result of Zeroed-In's conduct, Plaintiffs and the class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and

(b) remains backed up in Zeroed-In's possession and is subject to further unauthorized disclosures so long as Zeroed-In fails to undertake appropriate and adequate measures to protect the PII.

313.   Plaintiffs and class members are entitled to restitution and/or damages from Zeroed-In and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Zeroed-In from its wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiffs and class members may seek restitution or compensation.

314.   Plaintiffs and class members may not have an adequate remedy at law against Zeroed-In, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

### COUNT VII
### UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Classes, as Against Dollar Tree)

315.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

316.   This count is pleaded in the alternative to the breach of implied contract claim above against Dollar Tree (Count III).

317.   Plaintiffs and class members conferred a monetary benefit on Dollar Tree in connection with obtaining employment, specifically providing Dollar Tree with their PII. In exchange, Plaintiffs and class members should have received from Dollar Tree services or benefits that were the subject of the transaction, and

should have had their PII protected with adequate data security.

318.   Dollar Tree knew that Plaintiffs and class members conferred a benefit upon it and accepted and retained that benefit by accepting and retaining the PII entrusted to it. Dollar Tree profited from Plaintiffs' retained data and use Plaintiffs' and class members' PII for business purposes.

319.   Dollar Tree failed to secure Plaintiffs' and class members' PII and, therefore, did not fully compensate Plaintiffs or class members for the value that their PII provided.

320.   Dollar Tree acquired the PII through inequitable record retention as it failed to disclose the inadequate vendor vetting and data security practices previously alleged.

321.   If Plaintiffs and class members had known Dollar Tree would not use adequate data security practices, procedures, and protocols to adequately monitor, supervise, and secure their PII, or vendors that house their PII, they would not have entrusted their PII with Dollar Tree.

322.   Under the circumstances, it would be unjust for Dollar Tree to be permitted to retain any of the benefits that Plaintiffs and class members conferred upon it.

323.   As a direct an proximate result of Dollar Tree's conduct, Plaintiffs and the class have suffered and will suffer injury, including but not limited to: (i) the actual misuse of their compromised PII; (ii) invasion of privacy; (iii) lost or diminished value of PII; (iv) lost time and opportunity costs associated with

attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) an increase in spam calls, texts, and/or emails; and (vii) the continued and certainly increased risk to their PII, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Dollar Tree's possession and is subject to further unauthorized disclosures or further entrustment to inadequate third party vendors so long as Dollar Tree fails to undertake appropriate and adequate measures to protect the PII.

324.    Plaintiffs and class members are entitled to restitution and/or damages from Dollar Tree and/or an order proportionally disgorging all profits, benefits, and other compensation obtained by Dollar Tree from its wrongful conduct, as well as return of their sensitive PII and/or confirmation that it is secure. This can be accomplished by establishing a constructive trust from which the Plaintiffs and class members may seek restitution or compensation.

325.    Plaintiffs and class members may not have an adequate remedy at law against Dollar Tree, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

**COUNT VIII**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Classes, as Against Zeroed-In)**

326.    Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

327.    Zeroed-In became the guardian of Plaintiffs' and class members' PII.

Zeroed-In became a fiduciary, created by its undertaking and guardianship of Plaintiffs' and class members' PII, to act primarily for their benefit. This duty included the obligation to safeguard Plaintiffs' and class members' PII and to timely detect and notify Plaintiffs and class members in the event of a data breach.

328.   Zeroed-In knowingly undertook the responsibility and duties related to the possession of Plaintiffs' and class members' PII for the benefit of Plaintiffs and class members in order to provide Dollar Tree—and, by association, Plaintiffs and class members—human resources analytics services.

329.   Zeroed-In has a fiduciary duty to act for the benefit of Plaintiffs and class members within the scope of its relationship with them. Zeroed-In breached its fiduciary duties owed to Plaintiffs and class members by failing to properly protect PII. Zeroed-In further breached its fiduciary duties by failing to timely detect the Data Breach and notify and/or warn Plaintiffs and class members of the Data Breach.

330.  As a direct and proximate result of Zeroed-In's breaches of its fiduciary duties, Plaintiffs and class members have suffered or will suffer concrete injury, including, but not limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their PII is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the

loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII, which remains in Zeroed-In's possession and is subject to further unauthorized disclosures so long as it fails to undertake appropriate and adequate measures to protect Plaintiffs' and class members' PII in its continued possession; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the PII compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiffs and class members.

331.    As a direct and proximate result of Zeroed-In's breach of its fiduciary duty, Plaintiffs and class members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

**COUNT IX**
**BREACH OF FIDUCIARY DUTY**
**(On Behalf of Plaintiffs and the Classes, as Against Dollar Tree)**

332.    Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

333.    Dollar Tree became the guardian of Plaintiffs' and class members' PII. Dollar Tree became a fiduciary, created by its undertaking and guardianship of Plaintiffs' and class members' PII, to act primarily for their benefit. This duty included the obligation to safeguard Plaintiffs' and class members' PII and to timely detect and notify Plaintiffs and class members in the event of a data breach.

334.    In order to provide Plaintiffs and class members employment benefits and compensation, or to even consider Plaintiffs and class members for employment, Dollar Tree required that they provide their PII.

335.    Dollar Tree knowingly undertook the responsibility and duties related to the possession of Plaintiffs' and class members' PII in order to provide them with employment and employment benefits and compensation.

336.    Dollar Tree has a fiduciary duty to act for the benefit of Plaintiffs and class members upon matter within the scope of its relationship with them. Dollar Tree breached its fiduciary duties owed to Plaintiffs and class members by failing to properly protect Plaintiffs' and class members' PII. Dollar Tree further breached its fiduciary duties owed to Plaintiffs and class members by failing to timely detect the Data Breach and notify and/or warn Plaintiffs and class members of the Data Breach.

337.    As a direct and proximate result of Dollar Tree's breaches of its fiduciary duties, Plaintiffs and class members have suffered or will suffer concrete injury, including, but not limited to: (a) actual identity theft; (b) the loss of the opportunity to determine how and when their PII is used; (c) the unauthorized access, acquisition, appropriation, disclosure, encumbrance, exfiltration, release, theft, use, and/or viewing of their PII; (d) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft and/or unauthorized use of their PII; (e) lost opportunity costs associated with efforts expended and the loss of productivity addressing and attempting to mitigate the actual and future

consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (f) the continued risk to their PII, which remains in Defendants' possession and is subject to further unauthorized disclosures so long as Dollar Tree fails to undertake appropriate and adequate measures to protect PII in its continued possession and ensure that it retains vendors who adequately protect PII; and (g) future costs in terms of time, effort, and money that will be expended to prevent, detect, and repair the impact of the PII compromised as a direct and traceable result of the Data Breach for the remainder of the lives of Plaintiffs and class members.

338.   As a direct and proximate result of Dollar Tree's breach of its fiduciary duty, Plaintiffs and class members have suffered and will continue to suffer other forms of injury and/or harm, and other economic and non-economic losses.

## COUNT X
## BAILMENT
### (On Behalf of Plaintiffs and the Classes, as Against Dollar Tree)

339.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

340.   Plaintiffs, class members, and Dollar Tree contemplated a mutual benefit bailment when Plaintiffs and members of the class transmitted their PII to Dollar Tree solely for the purpose of obtaining employment.

341.   Plaintiffs and the class entrusted their PII to Dollar Tree for a specific purpose – to obtain employment – with an implied contract that the trust was to be faithfully executed, and the PII was to be accounted for when the special

purpose was accomplished.

342.   Dollar Tree accepted Plaintiffs' and class members' PII for the specific purpose of employment.

343.   Dollar Tree was duty bound under the law to exercise ordinary care and diligence in safeguarding Plaintiffs' and class members' PII.

344.   Plaintiffs' and class members' PII was used for a different purpose than what Plaintiffs and the class intended, for a longer time period than what was intended, and/or in a different manner or place than Plaintiffs and the class intended.

345.   Plaintiffs and members of the class were damaged as a result and are entitled to relief as set forth herein.

## COUNT XI
## DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf of Plaintiffs and the Classes, as Against Zeroed-In)

346.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

347.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

348.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and class members' PII and whether Defendants are currently

maintaining data security measures adequate to protect Plaintiffs and class members from further data breaches that compromise their PII. Plaintiffs allege that Zeroed-In's data security measures remain inadequate. Furthermore, Plaintiffs continue to suffer injuries as result of the compromise of their PII and remains at imminent risk that further compromises of their PII will occur in the future.

349.   Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following: (a) Zeroed-In owes a legal duty to secure PII and to timely notify impacted individuals of a data breach under the common law, Section 5 of the FTC Act, and various state statutes, and (b) Zeroed-In continues to breach this legal duty by failing to employ reasonable measures to secure PII in its possession.

350.   This Court should also issue corresponding prospective injunctive relief requiring Zeroed-In to employ adequate security protocols consistent with law and industry standards to protect PII in Zeroed-In's possession and control.

351.   If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at Zeroed-In. The risk of another such breach is real, immediate, and substantial. If another breach at Zeroed-In occurs, Plaintiffs and class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

352.   The hardship to Plaintiffs if an injunction is not issued exceeds the

hardship to Zeroed-In if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Zeroed-In of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Zeroed-In has a pre-existing legal obligation to employ such measures.

353.   Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Zeroed-In, thus eliminating the additional injuries that would result to Plaintiffs and class members whose confidential information would be further compromised.

### COUNT XII
### DECLARATORY AND INJUNCTIVE RELIEF
### (On Behalf of Plaintiffs and the Classes, as Against Dollar Tree)

354.   Plaintiffs restate and reallege paragraphs 1 through 201 above as if fully set forth herein.

355.   Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq*., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

356.   An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and class members' PII and whether Defendants are currently maintaining data security measures adequate to protect Plaintiffs and class

members from further data breaches that compromise their PII. Plaintiffs allege that Dollar Tree's data security measures and third-party vendor vetting remain inadequate. Furthermore, Plaintiffs continue to suffer injuries as result of the compromise of their PII and remain at imminent risk that further compromises of their PII will occur in the future.

357.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following: (a) Dollar Tree owes a legal duty to secure employees' PII, select vendors who handle PII that will adequately safeguard that information, and to timely notify impacted individuals of a data breach under the common law, Section 5 of the FTC Act, and various state statutes, and (b) Dollar Tree continues to breach this legal duty by failing to employ reasonable measures to secure PII in its possession.

358.    This Court also should issue corresponding prospective injunctive relief requiring Dollar Tree to employ adequate security protocols consistent with law and industry standards.

359.    If an injunction is not issued, Plaintiffs will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach at, or implicating, Dollar Tree. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiffs and class members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

360.   The hardship to Plaintiffs if an injunction is not issued exceeds the hardship to Dollar Tree if an injunction is issued. Plaintiffs will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Dollar Tree of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Dollar Tree has a pre-existing legal obligation to employ such measures.

361.   Issuance of the requested injunction will not disserve the public interest. In contrast, such an injunction would benefit the public by preventing another data breach at Dollar Tree, thus eliminating the additional injuries that would result to Plaintiffs and class members whose confidential information would be further compromised.

## **PRAYER FOR RELIEF**

Plaintiffs, individually and on behalf of all other members of the class, respectfully request that the Court enter judgment in Plaintiffs' favor and against Defendants as follows:

A.   Certifying the class(es) as requested herein, designating Plaintiffs as class representatives, and appointing Plaintiffs' counsel as Class Counsel;

B.   Awarding Plaintiffs and the class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.   Awarding Plaintiffs and the class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiffs, on behalf of themselves and

the class, seek appropriate injunctive relief designed to prevent Defendants from experiencing another data breach by adopting and implementing best data security practices to safeguard PII and to provide or extend credit monitoring services and similar services to protect against all types of identity theft;

D.     Awarding Plaintiffs and the class pre-judgment and post-judgment interest to the maximum extent allowable;

E.     Awarding Plaintiffs and the class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.     Awarding Plaintiffs and the class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

DATED: January 23, 2024                    Respectfully Submitted,

*/s/ Jeff Ostrow*
Jeff Ostrow FBN 121452
**KOPELOWITZ OSTROW
FERGUSON WEISELBERG
GILBERT**
One West Law Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 332-4200
E: ostrow@kolawyers.com

Tyler J. Bean*
**SIRI & GLIMSTAD LLP**
745 Fifth Avenue, Suite 500
New York, New York 10151
Tel: (212) 532-1091
E: tbean@sirillp.com

Maureen M. Brady (*pro hac vice*)
**MCSHANE & BRADY, LLC**
1656 Washington Street, Suite 120
Kansas City, MO 64108
Tel: (816) 888-8010
E: mbrady@mcshanebradylaw.com

William B. Federman (*pro hac vice*)
**FEDERMAN & SHERWOOD**
10205 N. Pennsylvania Ave.
Oklahoma City, OK 73120
Tel: (405) 235-1560
E: wbf@federmanlaw.com

Andrew W. Ferich (*pro hac vice*)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Tel: (310) 474-9111
E: aferich@ahdootwolfson.com

Gary F. Lynch*
**LYNCH CARPENTER, LLP**
1133 Penn Ave, 5th Floor
Pittsburgh, PA 15222
Tel: (412) 322-9243
E: gary@lcllp.com

Jean S. Martin*
**MORGAN & MORGAN**
**COMPLEX LITIGATION GROUP**
201 North Franklin Street, 7th Floor
Tampa, FL  33602
Tel: (813) 559-4908
E: jeanmartin@forthepeople.com

Jennifer S. Czeisler*
**STERLINGTON PLLC**
One World Trade Center, 85th Floor
New York, New York 10007
Tel: (212) 433-2993
E: jen.czeisler@sterlingtonlaw.com

*Interim Class Counsel for Plaintiffs
and the Putative Classes*

Edward W. Ciolko*
**STERLINGTON, PLLC**
One World Trade Center, 85th Floor
New York, New York 10007
Tel: (212) 433-2993
E: edward.ciolko@sterlingtonlaw.com

James M. Evangelista*
**EVANGELISTA WORLEY LLC**
10 Glenlake Parkway, Suite 130
Atlanta, Georgia 30328
Tel: (404) 205-8400
E: jim@ewlawllc.com

*Counsel for Plaintiffs and the
Putative Classes*

*Pro Hac Vice application
forthcoming*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing has been served via email via the CM/ECF system on all counsel of record on this 23rd day of January, 2024.

Unless there is an agreement to waive service, Family Dollar, LLC will be formally served through its registered agent.

/s/ Jeff Ostrow
Jeff Ostrow